UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                      :
BEAUTIFUL HOME TEXTILES (USA), INC.,                  :
ET AL.,                                               :
                                    Plaintiffs,       :            13 Civ. 1725(LGS)
                                                      :
                    -against-                         :            OPINION AND ORDER
                                                      :
BURLINGTON COAT FACTORY                               :
WAREHOUSE CORPORATION,                                :
                                    Defendant,    X
                                                      
------------------------------------------------------------

LORNA G. SCHOFIELD, District Judge:

 Plaintiffs Beautiful Home Textiles, Inc. ("BHT") and Alan Wang bring this action against

Defendant Burlington Coat Factory Warehouse Corporation.  BHT asserts claims for (1)

declaratory judgment; (2) injunctive relief; and (3) breach of contract.  Wang asserts claims for

(1) false advertising; (2) deceptive business practices; (3) breach of warranty; and (4) injunctive

relief.  Burlington asserts counterclaims against BHT for (1) breach of contract and (2) breach of

warranty.[1]

 Before the Court are cross motions for summary judgment.  Burlington moves to dismiss

all of Plaintiffs' claims and for summary judgment on its remaining counterclaims.  Plaintiffs

move to dismiss Burlington's remaining counterclaims and for partial summary judgment

awarding BHT $122,367.40 in payment for goods delivered to Burlington.  For the reasons

discussed below, Burlington's motion is granted in part and denied in part, and Plaintiffs' motion

is denied.

---

[1] Burlington's counterclaims for negligent misrepresentation, violation of the Textile Fiber
Products Identification Act and declaratory judgment were dismissed on July 25, 2013.

## I.    Facts

The facts are taken from the parties' summary judgment submissions and, as required, viewed in the light most favorable to the nonmoving parties on their respective motions.

### A. BHT and Burlington's Claims against Each Other

Defendant Burlington is an off-price apparel and home product retailer that purchases goods from over 520 retail outlets.  BHT is an importer and reseller of dry goods, including bed sheets.  Wang is the Vice-President of BHT.  BHT imports goods, including the goods that are the subject of this action, from a factory in China called "Zhejian Beautiful Elder Products Company limited."  Zhejan and BHT are both owned and operated by Decheng Jin.

On February 6, 2012, Jin signed the Electronic Data Interchange Agreement ("EDIA"), pursuant to which BHT as "Vendor" and Burlington as "Purchaser" agreed to do business.  Wang had previously reviewed the EDIA and explained its terms to Jin.

Section 3.1 of the EDIA provides that all transactions made under the EDIA are "subject to the terms and conditions . . . posted on the vendors section of Burlington's website" ("Terms and Conditions").  Plaintiffs claim that they did not realize this provision existed until shortly before this litigation.  Plaintiffs also claim that it is necessary to navigate a "labyrinth" of web pages to find the Terms and Conditions.

Paragraph 4 of the Terms and Conditions states, in part:

> Vendor warrants that the goods are merchantable and safe and free from defects in materials and workmanship and will conform to all order specifications. Purchaser, at its sole option, may retain, cancel, reject or dispose of all or any part of this Order which fails to comply with the foregoing warranties or the terms of the BCF Vendor Manual ("nonconforming merchandise'), and Purchaser's decision as to compliance shall be, in the absence of bad faith, final and binding on Vendor in all cases without inspection by Vendor, the retention or delivery of proof of nonconformity by Purchaser or any other action. Vendor authorizes Purchaser to at any time (and regardless of the time of the discovery of the nonconformity): (i) dispose of any such nonconforming merchandise by any available means, and (ii)

2

debit Vendor's account by (or otherwise collect from Vendor) (a) the amount invoiced by Vendor for such nonconforming merchandise, (b) the aggregate amount of any applicable charges specified in the BCF Vendor Manual, and (c) appropriate freight, handling and other expense Purchaser may incur in connection with such nonconforming merchandise

Paragraph 6 of the Terms and Conditions states, in part:

Vendor warrants that merchandise ordered will be properly marked as to weight, measure, country of origin, contents and ingredients and shall have been produced, sold, delivered, and furnished in strict compliance with all applicable laws and regulations, whether now in force or hereinafter enacted, to which they are subject ("applicable law"; for purposes of clarification, references to any applicable law herein shall be deemed to be references to such applicable law as amended as of the date of this Order.) Without limiting the generality of the foregoing, Vendor warrants that the goods sold hereunder comply with the provisions of the . . . Textile Fibers Products Identification Act . . .. Furthermore, any business practice engaged in by or on behalf of Vendor which is inconsistent with any applicable law or regulation will be considered a material breach of Vendor's covenants hereunder

Paragraph 8 of the Terms and Conditions states, in part: "Purchaser shall have the right to set off any monies owed to Purchaser by Vendor (including for breach of contract or warranty) against any monies due Vendor from Purchaser under any contracts between the parties."

Paragraph 12 of the Terms and Conditions states, in part:

Vendor agrees to indemnify and hold harmless Purchaser from and against any and all judgments, settlements, disbursements, costs (including reasonable attorney's fees) and other expenditures occasioned by any allegations, legal actions or other claims that .... has given rise to liability to any third party or parties for personal injuries and/or property damage under any legal theory including, without limitation, product liability, strict liability, breach of warranty or negligence.

In 2012, Mark Burke, BHT's National Accounts Manager, solicited, and Burlington issued, various purchase orders, pursuant to which BHT agreed to sell and deliver to Burlington approximately 73,503 "Units" of bed sheets ("Purchase Orders"). The parties dispute the number of Purchase Orders. The Purchase Orders included, among other information, the thread count of the sheets to be delivered by BHT to Burlington. Some of the Purchase Orders also required the

3

sheets to be 100% cotton.  BHT accepted the Purchase Orders and agreed to deliver the Units to Burlington.

Between March and December 2012, BHT delivered 40,499 Units to Burlington's warehouse, which were then distributed to Burlington's retail stores ("Delivered Units").  These Units were allegedly inspected by Zhejan, but not by BHT, prior to delivery.  With each delivery, BHT submitted electronic invoices to Burlington ("Invoices").  The Invoices included, among other information, the purported thread count of the Units.  The purported thread count and fiber content of the Units was also listed on BHT's packing lists.  Additionally, each Unit had an affixed label that stated the purported thread count and fiber content of the specific Unit.  Each label stated that the Unit was 100% cotton.

Burlington claims that it relies on its vendors, such as BHT, to ensure that products are labeled lawfully and truthfully.  After a Burlington linens buyer received notification that labels on certain sheet sets may have been inaccurate, on November 14, 2012, Angela Curry, Burlington's Compliance Counsel, notified BHT and other vendors by letter that Burlington would be conducting audits of sheet sets to ensure that the thread count and fiber content was as represented.  The letter stated that if the Units failed the audit, "Burlington reserves the right to discontinue sale of the inferior goods, terminate our business relationship, deduct all expenses we incur (including attorneys' fees) from payments to you as a result of your shipment of nonconforming goods, and pursue all appropriate legal remedies against you . . . ."

Burlington then sent samples of BHT's Delivered Units to Intertek Consumer Goods for testing.  On December 17, 2012, Intertek issued a report stating that a tested BHT Unit with a label representing that the Unit had a thread count of 450 actually had a thread count of 279 ("First Report").  Due to the First Report, Burlington cancelled the delivery of the 33,004 Units

4

from BHT that were not yet delivered ("Cancelled Units").  On December 18, 2013, Stephanie Tholey, Burlington's Assistant Buyer-Linens, emailed Burke at BHT, stating, "FYI – we tested the 450 [thread count] sheet.  It came back as a 300 [thread count] . . . We are testing more of your sheets but this could hit the fan."

On December 19, 2012, Wang sent an email to Burke stating that BHT would test units through ITS Shanghai.  According to Wang, two Units were tested by ITS Shanghai, one of which passed and the other failed as to thread count.  These test results have not been produced.

On December 31, 2012, Intertek issued another report to Burlington stating that a tested BHT Unit with a label representing that the Unit was 100% cotton with a 400 thread count was actually 100% rayon with a 314 thread count ("Second Report").  On January 2, 2013, Tholey at Burlington emailed Burke at BHT again, stating, "we just tested the 400 all cotton – Came back as 100% rayon . . . I don't think I need to tell you the severity of this situation.  We will be calling to discuss."

On January 3, 2013, after speaking to Jin, Wang sent an email to Burke, which stated, "[m]aybe a few pieces of Rayon sheets mixed in is possible."  Burke responded to Wang, stating, in part, that "we really have no way to take goods back and relabel them."  In this email Burke of BHT also stated:

> It is really hard to believe that with 1% of the goods in Rayon, per Mr. Jin, that they picked the 1 sheet set that was rayon.  You understand that les[s] than 1% in rayon means that in a container of goods, 8000 sheet sets, that less than 80 sets would be rayon and with 500 stores, they happened to pick the 1 sheet set[] that was rayon.  I think the percentages are way off.  I don't believe Mr. Jin and neither should you.

Due to the First and Second Reports, on January 7, 2013, Burlington recalled the remainder of the 40,499 delivered Units placed in Burlington's retail stores and ordered these Units to be destroyed.  This resulted in a recall of 4,386 Units ("Recalled Units").

The other Units had been sold to consumers at Burlington's retail stores ("Sold Units"). Burlington made a profit of approximately $380,000 on the Sold Units.  Burlington destroyed all but 87 of the Recalled Units ("Destroyed Units").   The destruction, according to BHT, constituted acceptance of the Destroyed Units, and according to Burlington, was an exercise of a contractual remedy and not acceptance.

Burlington has partially paid BHT for the Sold Units.  BHT claims that there are nineteen unpaid Purchase Orders.  The parties dispute the amount unpaid, with Burlington claiming $117,000 and BHT claiming $122,367.40.  Burlington claims that it has rightly withheld the $117,000 in accordance with the Terms and Conditions and in light of BHT's alleged breaches.

On January 8, 2013, Stacy Haigney, Burlington's Assistant General Counsel, sent a letter to BHT, stating that "[BHT's] delivery of such merchandise constitutes an entire breach of its sales contract with [Burlington] and the warranties expressed and implied by the contract and the law."  BHT claims that this notice did not identify the transaction to which it referred, while Burlington maintains that it concerned all transactions.

On January 15, 2013, Intertek issued a "Third Report" stating that a tested BHT Unit with a label representing that the Unit was 100% cotton with a 300 thread count was actually 55% polyester and 45% cotton with a 278 thread count.  On January 17, 2013, Wang sent an email to Haigney, which stated, in part, "There was a 'Purchase Order Terms and Conditions' attached to your letter.  Beautiful Home Textile had never received or been advised by any of these 'Terms and Conditions' prior to your letter.  We were not aware of any of these terms and conditions."

Burlington claims damages of $480,506.78, including lost profits on both the Recalled Units and the Cancelled Units.  BHT disputes these damages.

BHT sold the majority of the Cancelled Units to a different retailer.  On May 28, 2013, Burlington's counsel, Harlan Lazarus, informed outside counsel for BHT, Richard Pu, that BHT's sale of the Cancelled Units without notice to Burlington constituted destruction of evidence and violated the law.  Plaintiffs stated in their June 24, 2013 response to Defendant's Request for Production and in a subsequent letter that BHT would make the Cancelled Units still possessed by BHT available for inspection at its California warehouse.

BHT sold the remaining Cancelled Units to a different retailer on July 9, 2013, and shipped them to the retailer on July 17, 2013.  On July 25, 2013, Pu told Lazarus via phone that Burlington could inspect the Cancelled Units.  Then, on July 26, 2013, Pu informed Lazarus that BHT had sold all of the Cancelled Units.

On September 17, 2013, Burlington sent the remaining 87 Recalled Units to Intertek for testing.  Between September 20, 2013 and October 16, 2013, Intertek reported that 81 of the 87 Units did not conform to the specifications on their respective labels.

### B.  Wang's Claims against Burlington

On February 27, 2013, Wang purchased a set of sheets at a Burlington retail store in City of Industry, California ("Wang Sheets").  Wang alleges that the Wang Sheets were sent to Intertek for testing and that they did not conform to the specifications on their label.

Wang did not provide the Intertek test results to Burlington and did not notify Burlington that the Wang Sheets were not as labeled prior to filing the complaint in this action.  The Wang Sheets have not been produced by Plaintiffs in this action.

## II.    Standard of Review

Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim.  *See Celotex,* 477 U.S. at 322-23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact.  *See id.* at 322.  In satisfying this burden, the non-moving party cannot rely merely on allegations or denials of the factual assertions of the

moving party.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 324.  Moreover, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).  The non-moving party must present specific evidence in support of its contention that there is a genuine dispute as to the material facts.  *See Celotex,* 477 U.S. at 324.  Furthermore, to demonstrate a genuine dispute as to the material facts, the non-moving party must come forward with sufficient evidence to permit a reasonable jury to return a verdict in his favor.  *See Anderson*, 477 U.S. at 242, 248.

### III.   Discussion

#### A.  BHT's Claims against Burlington

##### i.  Declaratory Judgment

BHT seeks a declaratory judgment that paragraph 4 of the Terms and Conditions, the provision concerning nonconforming goods, is unconscionable and illegal.  Burlington moves for summary judgment dismissing this claim.  This motion is granted, as BHT's claim for declaratory judgment is duplicative of its breach of contract claim.

A court must entertain a declaratory judgment action only where either: (1) "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue," or (2) "it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992). Here, the declaratory judgment sought by BHT does not meet either of these tests.  This claim is based on the same alleged facts and circumstances underlying BHT's claim for breach of contract and seeks no relief that is not implicitly sought in the breach of contract cause of action.  *See*, *e.g.*, *Sofi Classic S.A. de C.V. v. Hurowitz,* 444 F.Supp.2d 231, 249-50 (S.D.N.Y. 2006).

BHT argues that the enforceability of paragraph 4 of the Terms and Conditions will not necessarily be adjudicated in connection with the breach of contract cause of action, as BHT could prevail on other grounds without this issue being reached.  If that does happen, however, then there would no longer be a judiciable controversy.  In order for an action for declaratory judgment to "satisfy the case-or-controversy requirement," the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests . . . as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks omitted).

BHT further argues that it may sell to Burlington in the future and, if so, then the legality of paragraph 4 would again become relevant.  However, an "intangible worry, unanchored in time" is "'insufficient to support an actual or imminent injury for standing without any specification of *when* the some day will be.'"  *Organic Seed Growers and Trade Ass'n v. Monsanto Co.*, 851 F.Supp.2d 544, 555 (S.D.N.Y. 2012) (quoting *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 653 F.3d 1329, 1346 (Fed. Cir. 2011)).  In other words, if it is "'uncertain when, if ever'" a situation giving rise to the need for a declaratory judgment would arise, then the dispute does "'not present a case or controversy of sufficient immediacy to support a declaratory judgment.'"  *Id.* (quoting *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 881 (Fed. Cir. 2008)).  BHT's declaratory judgment claim is dismissed.

### ii.  Injunctive Relief

BHT seeks an injunction barring Burlington from further use of paragraph 4 of its Terms and Conditions.  Burlington moves for summary judgment dismissing this claim.  This motion is

granted, as BHT cannot show that it has suffered an irreparable injury for which monetary damages are inadequate compensation.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

BHT alleges that Burlington has failed to pay for all of the Units that BHT delivered to Burlington, resulting in an unpaid balance of $122,577.40 plus other injuries for a total loss of $1,124,841.00.  Because BHT has quantified its alleged injury, it cannot also claim to have suffered an irreparable injury.  "Irreparable injury is one that cannot be redressed through a monetary award."  *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).  Therefore, "it is settled law that when an injury is compensable through money damages there is no irreparable harm."  *Id.*

BHT argues that it needs the injunction for purposes of further dealings with Burlington.  But this is an argument about future, speculative harm.  "To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent."  *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (internal quotation marks omitted).  It is unlikely that Burlington would choose to do business with BHT again, and if Burlington did make such an offer, then BHT could renegotiate the Terms and Conditions before entering into any agreement.  Accordingly, BHT's claim for an injunction fails as a matter of law and Burlington's motion for summary judgment dismissing this claim is granted.

11

### iii.  Breach of Contract

BHT claims that Burlington breached the agreement between the parties by failing to pay BHT for goods delivered to Burlington as well as by cancelling the delivery of other goods.  BHT moves for partial summary judgment on this claim, awarding BHT $122,367.40 in payment for goods delivered to Burlington.  Burlington moves for summary judgment dismissing this claim.  Both motions are denied, as resolution of this claim involves genuine issues of disputed material facts.

BHT argues that Burlington accepted all of the Delivered Units and thus owes BHT the contract price for all of them, but has paid for only some.  Under the New York Uniform Commercial Code ("UCC"), "[t]he buyer must pay at the contract rate for any goods accepted."  N.Y. U.C.C. § 2-607(1).  According to the UCC, a buyer accepts goods when it "does any act inconsistent with the seller's ownership."  *Id.* at § 2-606(1)(c).  Here, Burlington accepted all of the Delivered Units, as it placed them for sale in its retail stores; therefore, Burlington owes BHT the contract price for the Delivered Units.  Yet, there is a dispute between the parties as to whether $117,000.00 or $122,367.40 is outstanding as to the Delivered Units.

Burlington also argues that it is not required to pay BHT the balance owed for the Delivered Units for three reasons.  First, Burlington asserts that rendering a judgment for BHT on its breach of contract claim would be enforcing BHT's unlawful conduct.  This is incorrect.  Burlington argues that the Terms and Conditions required BHT to comply with the Textile Products Identification Act ("TFPIA") and that BHT did not do so.  Burlington relies on *Bromberg v. Moul*, 275 F.2d 574 (2d Cir. 1960), which held that courts "should not permit themselves to be made the instrument for the carrying out of an illegal contract" and that "a seller

cannot recover the sale price when judgment in his favor would itself be enforcing the precise conduct made unlawful."  *Id.* at 577-78 (internal quotation marks omitted).

In *Bromberg*, however, the court based its holding on the black letter proposition that a court will not enforce an illegal contract.  In that case, "the prices established *in the alleged contract* violated a regulation of the Office of Price Stabilization."  *Id.* at 576 (emphasis added). Here, in contrast, the agreement between Burlington and BHT did not violate the TFPIA.  While BHT may have violated the TFPIA by delivering goods that did not conform to label specifications – and resolving this question involves genuine issues of material fact – even if it did, this does not make the contract itself illegal, as the contract provided that the parties *comply* with the TFPIA.

Next, Burlington argues that BHT cannot recover under its breach of contract claim because of BHT's alleged anticipatory repudiation.  This argument fails.  Section 2-609 of the UCC provides that "failure to provide . . . assurance of due performance . . . is a repudiation of the contract."  N.Y. U.C.C. § 2-609(4).  Section 2-610 of the UCC provides that if a party "repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . . suspend his own performance . . . ."  *Id.* at § 2-610.

Burlington maintains that after it discovered that past deliveries from BHT were allegedly non-conforming, Burlington informed BHT of its failure to perform in accordance with the parties' agreement, and BHT failed to provide adequate assurance that its deliveries would comply with the agreed-upon specifications.  While this may be the case, it does not absolve Burlington from its responsibility to pay for goods already delivered and accepted.  Section 2-609 of the UCC concerns parties asking for assurances regarding *future* performance.  *See Id.* at § 2-

13

609(3) ("Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of *future* performance.") (emphasis added).

Finally, Burlington argues that BHT cannot recover on its breach of contract claim because the damages claimed by BHT are completely offset by Burlington's damages stemming from its counterclaims. Whether Burlington has a legitimate setoff cannot be resolved on summary judgment, as doing so involves genuine issues of disputed material facts.

BHT makes two arguments in response to Burlington's setoff argument. First, BHT argues that Burlington is barred from advancing counterclaims due to the fact that Burlington's communications regarding the non-conforming Units ("Communications") failed to comply with the UCC's requirements. Specifically, BHT maintains that none of the Communications identified a specific transaction and that when the Communications were sent, all of the Units had either been sold or were about to be destroyed; therefore, they arrived too late for claims of non-conformity to be investigated. Burlington, on the other hand, maintains that the Communications made clear, and BHT understood, that *all* of the transactions between it and BHT were at issue and that the Communications were sent merely days after the First and Second Reports.

Under the UCC, if a buyer who has accepted goods wishes to "recover . . . damages for any non-conformity," it "must within a reasonable time after [it] discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Id.* at §§ 2-714(1); 2-607(3)(a). "Where there have been multiple transactions between the seller and the buyer the notice of a breach should . . . identify the particular transaction concerning which notification is made." *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 13 (1974); *see also* N.Y. U.C.C. § 2-607, Comment 4 ("The content of the notification need merely be sufficient to let the seller know that the *transaction* is still troublesome and must be watched." (emphasis added)).

Here, there are genuine issues of material fact regarding the adequacy of Burlington's notice and whether it was sent within a reasonable time after Burlington should have discovered any breach.  Numerous purchase orders existed between the parties, and the Delivered Units were from various different production runs and were delivered to Burlington on different dates.  Moreover, the Units tested by Intertek came from a Burlington retail store, so it is unknown from which delivery they originated.

Second, BHT argues that Burlington cannot show any damages stemming from its counterclaims.  BHT maintains that Burlington sold all but 4,386 of the Delivered Units at full price, creating a profit for Burlington of approximately $380,000, and that the remaining Units likewise could have been sold.

Under the UCC, a buyer "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."  N.Y. U.C.C. § 2-714(1).  "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  *Id.* at § 2-714(2). "In a proper case any incidental and consequential damages . . . may also be recovered."  *Id.* at § 2-714(3).  Here, Burlington tested only 87 of the approximately 40,000 Delivered Units, originating from numerous production runs.  Therefore, there are genuine issues of material fact regarding how many Delivered Units were actually non-conforming, as well as regarding the amount of damages suffered by Burlington and whether they could have been mitigated.

In conclusion, both Plaintiffs' motion and Defendant's motion for summary judgment on BHT's breach of contract claim must be denied, as it raises genuine issues of disputed material facts including, but not limited to, the following:

1) Whether the amount unpaid for the Delivered Units is $117,000.00, $122,367.40 or some other amount;

2) Whether Burlington's communications adequately identify, and whether Burlington was aware, that all of the transactions between the parties were at issue;

3) Whether the Intertek Reports were sufficient to establish that Units from various production runs and delivery batches were non-conforming;

4) Which BHT delivery the Units tested at Intertek came from;

5) When Burlington should have discovered the non-conforming Units;

6) How many Units were non-conforming;

7) What damages were suffered by Burlington;

8) Whether any of the damages suffered by Burlington could have been mitigated;

9) Whether Burlington acted in good faith in destroying the unsold goods; and

10) Whether BHT had a culpable state of mind and engaged in the spoliation of evidence, warranting an adverse inference.

### B. Wang's Claims against Burlington

#### i. False Advertising

Wang claims that Burlington engaged in false advertising in violation of (1) the Lanham Act, 15 U.S.C. § 1125; (2) New York General Business Law § 350; and (3) the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310. Burlington moves for summary judgment dismissing this claim. This motion is granted, as Wang's claim is facially defective under each of those statutes.

#### a. Lanham Act

The Lanham Act's "purpose . . . is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct." *Colligan v. Activities Club of New*

*York, Limited*, 442 F.2d 686, 692 (2d Cir. 1971).  In accordance with this purpose, the Second

Circuit "has limited standing to assert a [Lanham Act] claim to a purely commercial class of

plaintiffs."  *Berni v. International Gourmet Restaurants of America, Inc.*, 838 F.2d 642, 648 (2d

Cir. 1988) (internal quotation marks omitted).  In other words, "standing to bring a [Lanham Act]

claim requires the potential for a commercial or competitive injury" because the "statute protects

against commercial, not consumer, injury." *Id.*  Since Wang purchased the sheets at issue as an

individual consumer, not a commercial party, he has no standing to bring a claim under the

Lanham Act.

　　Wang argues that he does have standing because he derives his salary from BHT, who is a

direct competitor of the Burlington vendor whose mislabeled goods he purchased.  Wang further

argues that the commercial injury at stake here is the risk of diminution of his salary.  These

arguments fail.  The fact that Wang is paid a salary by BHT does not change the fact that he

brings this claim as an individual consumer.

### b.  New York General Business Law § 350

　　New York General Business Law § 350 prohibits "false advertising in the conduct of any

business, trade or commerce or in the furnishing of any service *in this state*."  New York General

Business Law § 350 (emphasis added).  The New York Court of Appeals has held that the

inclusion of the words "in this state" in statutory language "unambiguously evinces a legislative

intent to address commercial misconduct occurring within New York."  *Goshen v. Mutual Life*

*Ins. Co. of New York*, 98 N.Y.2d 314, 324-25 (2002).  Since it is undisputed that Wang purchased

the sheets at issue in California, this claim fails.

　　Wang relies on *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013), to argue that

his claim should survive.  Wang's argument misunderstands the holding of *Cruz*.  The *Cruz* court

held that "a deceptive transaction *in New York* . . . suffices to give an out-of-state victim who engaged in the transaction statutory standing to sue . . . ." *Cruz*, 720 F.3d at 123 (emphasis added).  Here, no part of the transaction at issue – Wang's purchase of sheets at a California Burlington retail location – occurred in the State of New York.

### c.  Magnuson-Moss Warranty Act

The Magnuson-Moss Warranty Act ("MMWA") applies to breach of warranties, not to false advertising.  *See* 15 U.S.C. § 2310.  Accordingly, Wang's claim for false advertising under the MMWA fails as a matter of law.  Wang argues that the fact that he mislabeled his claim is of no consequence, as Burlington did breach a warranty.  However, because Wang also has a claim for breach of warranty, his MMWA claim will be analyzed thereunder.

Wang's claim for false advertising fails under all three statutes.  Accordingly, Burlington's motion for summary judgment dismissing this claim is granted.

### ii.  Deceptive Business Practices

Wang claims that Burlington engaged in deceptive business practices in violation of New York General Business Law § 349.  Burlington moves for summary judgment dismissing this claim.  This motion is granted, as Wang's claim is facially defective.

New York General Business Law § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service *in this state*." New York General Business Law § 349 (emphasis added).  As discussed above, the inclusion of the words "in this state" means that the statute applies only to "commercial misconduct occurring within New York." *Goshen*, 98 N.Y.2d at 324-25.  Because the transaction at issue occurred in California, this claim fails.

### iii.  Breach of Warranty

Wang brings a claim against Burlington for breach of warranty under both the MMWA and New York state law.  Burlington moves for summary judgment dismissing this claim.  This motion is granted, as Wang's claim fails under both laws.

### a.  MMWA

The MMWA provides a remedy for consumers who are "damaged by the failure of a . . . warrantor . . . to comply with any obligation . . . under a written warranty."  15 U.S.C. § 2310(d)(1).  The MMWA defines a "written warranty" as:

> any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship *and* affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time.

15 U.S.C. § 2301(6)(A) (emphasis added).

Accordingly, where a label does not promise either that the product is defect free or that it will meet a specified level of performance over a specified period of time, courts hold that those labels do not constitute a written warranty.  *See*, *e.g.*, *In re Frito-Lay North America, Inc. All Natural Litigation*, No. 12–MD–2413, 2013 WL 4647512, at *17 (E.D.N.Y. Aug. 29, 2013) (holding that the words "All Natural" did not constitute a written warranty because it neither promised that the product was defect free nor that it would meet a specified level of performance over a specified period of time); *Brazil v. Dole Food Co., Inc.*, 935 F.Supp.2d 947, 966 (N.D. Cal. 2013) (same).  Instead, courts hold that these labels are "at most, product descriptions."  *In re Frito-Lay*, 2013 WL 4647512, at *17 (internal quotation marks omitted); *see also Brazil*, 935 F.Supp.2d at 966.

Here, Wang claims that the sheets he bought from Burlington were labeled "100% cotton" and listed a specific thread count.  Wang further claims that testing these sheets showed that they were in fact not 100% cotton and did not actually contain the specified thread count.  The words "100% cotton" and a stated thread count, however, cannot constitute a written warranty under the MMWA because neither of these labels promises that the sheets are defect-free nor that they will meet a specified level of performance over a specified period of time.

Wang argues that specified fiber content and thread count on a label does constitute a written warranty under the MMWA because the fiber content and thread count of a set of sheets determines its performance over time.  This argument fails.  Even assuming it is correct that fiber content and thread count impact performance over time, listing the fiber content and thread count on a label still does not constitute a promise a *specified* level of performance over a *specified* period of time.

### b.  New York State Law

Before bringing a claim for breach of warranty under New York state law, a plaintiff must "within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  N.Y. U.C.C. § 2-607(3)(a).  Because Wang does not produce any evidence that he notified Burlington of the alleged breach of warranty prior to bringing suit, this claim is barred.

Wang argues that service of the complaint in this case suffices as notice.  This is incorrect.  Courts have routinely held that service of a complaint does not satisfy the notice requirement.  *See*, *e.g.*, *Lynx, Inc.*, 273 Md. at 17 ("Since the existence of a right of action is conditioned upon whether notification has been given the seller by the buyer . . . the institution of an action by the buyer to recover damages cannot by itself be regarded as a notice of the breach contemplated

under . . . 2-607(3)"); *see also Hubbard v. General Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at \*5 (S.D.N.Y. May 22, 1996).

Wang's claim for breach of warranty fails under both statutes.  Accordingly, Burlington's motion for summary judgment dismissing this claim is granted.

### iv.  Injunctive Relief

Wang seeks an injunction requiring Burlington to test goods in accordance with MIL-STD-105E (the "Military Standard") before labeling goods and offering them for sale to the public.  Burlington moves for summary judgment dismissing this claim.  This motion is granted, as Wang cannot show that he suffered irreparable injury or that his requested injunction complies with the statutory conditions for injunctive relief.

As discussed above, a plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc.*, 547 U.S. at 391.

Wang's claim for injunctive relief is based on the same facts as his claims for monetary relief.  As discussed above, "when an injury is compensable through money damages there is no irreparable harm."  *JSG Trading Corp.*, 917 F.2d at 79.  Wang argues that under New York's General Business Law § 349, a plaintiff does not need to establish irreparable harm because the statute itself provides for the issuance of an injunction.  This argument fails.

"When an injunction is expressly authorized by statute . . . the Court must look to the 'statutory conditions for injunctive relief,'" and may issue an injunction only "if those conditions are met."  *U.S. v. Broccolo*, No. 06-CV-2812, 2006 WL 3690648, at \*1 (S.D.N.Y. Dec. 13, 2006)

(quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir.1975)).  New York's General Business Law § 349 permits "any person who has been injured by reason of any violation of this section" to "bring an action in his own name to enjoin such unlawful act or practice."  New York General Business Law § 349(h).  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." New York General Business Law § 349(a).

Selling products that do not conform to the specifications on their labels is arguably a deceptive business practice.  However, Wang does not seek an injunction prohibiting Burlington from selling goods that do not conform to label specifications, but instead seeks an injunction requiring Burlington to test goods in a specified way, *i.e.*, the Military Standard or its equivalent. Failing to test goods in a certain, specific way is not a deceptive business practice; therefore, Wang's request for an injunction does not comply with the statutory conditions for injunctive relief.

Moreover, § 349 provides that "an injunction may be granted under article sixty-three of the civil practice law and rules" ("CPLR").  New York General Business Law § 349(b).  Under Article 63 of the CPLR, in order to be entitled to a preliminary injunction, a plaintiff must demonstrate irreparable harm.  *See Aetna Ins. Co. v Capasso*, 75 N.Y.2d 860, 861-62 (1990). Accordingly, Wang's claim for an injunction fails as a matter of law, and Burlington's motion for summary judgment dismissing this claim is granted.

### C.  Burlington's Counterclaims against BHT

#### i.  Breach of Contract

Burlington claims that BHT breached the agreement between the parties by failing to deliver goods to Burlington in accordance with the agreed-upon specifications.  Burlington moves

for summary judgment on this claim, and BHT moves for summary judgment dismissing this claim.  Both motions are denied because, as discussed above in connection with BHT's claim for breach of contract, resolution of this claim involves genuine issues of disputed material facts including, but not limited to, those listed above.

### ii.  Breach of Warranty

Burlington claims that BHT breached express and implied warranties that the Units would conform to the agreed-upon specifications.  Burlington moves for summary judgment on this claim, and BHT moves for summary judgment dismissing this claim.  Both motions are denied because, as discussed above in connection with BHT's claim for breach of contract, resolution of this claim involves genuine issues of disputed material facts including, but not limited to, those listed above.

## IV.   Conclusion

Burlington's motion for summary judgment dismissing Plaintiffs' claims is GRANTED IN PART AND DENIED IN PART in that all of Plaintiff Wang's claims (Counts IV to VII) are dismissed; and Plaintiff BHT's first two claims (Counts I and II) are dismissed, but the claim for breach of contract (Count III) survives.  Plaintiffs' motion for summary judgment is DENIED and both of Burlington's counterclaims survive.

The Clerk of Court is directed to close the motions at docket numbers 79 and 85.

SO ORDERED.

Dated:  August 15, 2014
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

23